THE STATE OF DELAWARE,

*vs.*

JOHN W. MAURY, KENDAL M. LEWIS, STEPHEN GREEN, and WILLIAM TUNNELL.

*New Castle, Sept.·T.* 1851.

A court of equity has jurisdiction of a bill filed to restrain the further drawing of a lottery, under color of an Act of the General Assembly authorizing a lottery for raising a certain sum of money, upon the alleged ground that certain pre-requisites to the exercise of such authority, prescribed by the act, have not been complied with, and also that the authority granted has been exhausted by the drawing of lottery schemes competent to raise the required sum. Such irregular or excessive drawings is a breach of the trust confided by the act, and as such is remediable in equity. The Court has also jurisdiction for the purpose of discovery, in order to ascertain whether the authority granted has been exhausted.

By an Act of the General Assembly, certain trustees were authorized to appoint a manager or managers, to institute, carry on and draw a lottery for raising a sum not exceeding $25,000, to be applied to certain public objects; the manager or managers to give bond to the State with surety to be approved by a Judge, conditioned for a faithful performance of duty in the sale of tickets and drawing of the lottery, and in paying over to the trustees, or their successors, the net proceeds thereof. All expenses were by the act directed to be paid out of the proceeds of the lottery, and the net proceeds to be paid over to the trustees, to be by them applied to the purposes of the act. A bill was filed, alleging that the trustees had exceeded their authority under the Act, by undertaking to enter into a contract to grant to certain managers, appointed by them, the privilege of drawing a lottery for a term of years, in consideration of an annual sum, to be paid to the trustees for the purposes of the act; also alleging that the managers appointed had failed to give bond in conformity with the provisions of the act ; also alleging that the managers had exhausted their authority under the act by drawing more than the sum required—*Held*, that upon such a bill a court of equity has jurisdiction to restrain the further drawing of the lottery.

Indictment under the general act against the illegal drawing of lotteries is not an adequate remedy, such as to oust the jurisdiction of a court of equity—an indictment being *punitive* only and not *preventive.*

The drawings being made under a license granted, and being invalid for irregularity only, neither an indictment nor a writ of *quo warranto* would lie. Adequate relief can be had only in a court of equity.

An agent or trustee, when called to account under a bill in equity for an irregular or unauthorized exercise of powers, cannot object to making discovery of his transactions, on the ground that they are such as may subject him to a criminal charge, the object of the bill not being to enforce a criminal liability, but only to restrain from further unauthorized acts.

Bill for an injunction to restrain a lottery.—By an act of the General Assembly, entitled "An Act for the benefit of Sussex County," passed February 13th, 1835,* three trustees were appointed, with power to elect or appoint one or more persons, not exceeding five, as managers,

---

* The material provisions of the act referred to are as follows :—

Sec. 1. *Be it enacted &c.,* That William D. Waples, Philip Short and Robert H. Griffith, of Sussex County, be and they are hereby appointed trustees, for the purpose of carrying into effect the objects of this act; and it shall and may be lawful for the said trustees, or their successors, at any meeting to be held by them at Georgetown, in said county, after the passing of this act, and by a majority of votes of the said trustees who shall then be assembled, to elect and appoint one or more person or persons, not exceeding five in number, as manager or managers, to institute, carry on and draw a lottery, in one or more classes, for raising a sum not exceeding twenty five thousand dollars, clear of all exepenses, costs, charges, &c.—(The section proceeds to appropriate the fund.)

Sec. 3. *And be it further enacted,* That the said manager or managers previously to the publication of any scheme and the sale of any tickets in said lottery, shall give bond to the State of Delaware, in such sum and with such security as any one or more of the Judges of the Superior Court shall approve of, conditioned for the true and faithful performance of the duty of the said manager or managers in the sales of tickets, drawing the classes of said lottery, paying the prizes, paying over to the said trustees, or their successors, the net proceeds of said lottery, and managing all the business thereof.

Sec. 6. *And be it further enacted,* that all expenses necessarily attending the carrying of this act into effect, so far as relates to the instituting, carrying on and drawing said lottery, shall be paid by said manager or managers, out of the proceeds thereof.

to institute, carry on and draw a lottery, for raising a sum not exceeding $25,000, for certain public objects in the act specified.   On the 11th of March, 1837, William D. Waples, Philip Short and David Hazzard, then being the trustees, appointed Dudley S. Gregory manager of said lottery; and the trustees, assuming to act under the authority of the act, entered into a contract with Gregory to sell to him the privilege of drawing the lottery for a certain term of years, in consideration of $25,000 (the sum authorized to be raised) to be paid by him to the trustees, in certain annual installments, during the term limited for drawing the lottery.   Gregory proceeded to draw the lottery, and during the time of his drawing paid to the trustees the gross sum of $8,000.   Upon the 1st of July, 1841, he declined further to draw; and, thereupon, the trustees appointed James G. Gregory and Daniel McIntyre, managers, to draw the lottery ; and the trustees also entered into a contract to sell and assign to them the privilege of drawing for a certain other term of years, in consideration of their paying to the trustees, in certain annual installments, the unpaid residue of the sum of $25,000, authorized by the act to be raised.   Under this grant, Gregory and McIntyre proceeded to draw the lottery, and during the time of their drawing paid to the trustees the further sum of $7,875.00.   On the 1st of January, 1847, Gregory and McIntyre declining further to draw, the trustees appointed Benjamin P. Gregory and John W. Maury, managers, to draw the lottery, at the same time entering into a contract to sell and assign to Gregory and Maury the privilege of drawing for a certain other term of years in consideration of their paying to the trustees, in certain annual installments, the unpaid residue of the sum of $25,000, authorized by said act to be raised.*   Under this

---

* The contract of the trustees with Gregory & Maury, after setting forth the act of Assembly and the prior proceedings under it, proceeded to appoint Gregory & Maury managers of the lottery ; and then stipulated as

last grant Gregory and Maury proceeded to draw the lottery, and were so drawing when this bill was filed.

The bill contested the right of the present managers to draw the lottery, on several grounds, viz: .

(1) That, although Gregory and Maury had been, in form, appointed managers, to draw only as agents for the State, according to the terms of the act, yet that in fact

follows *viz;* that the trustees, " for and in consideration of the sums of money hereinafter mentioned, as to be paid by the said parties of the second part, do transfer, dispose of, sell, assign and set over to them, the said Benjamin P. Gregory and John W. Maury, the full and exclusive power, authority, rights and privileges of instituting, carrying on and drawing the lottery by the said act authorized, in one or more classes, as they, in each and every year during the continuance of this agreement, from time to time may deem necessary and proper to draw, upon the combination or combination and permutation of numbers, or other fair plan. And the said parties of the first part do, by these presents, agree with the said parties of the second part, that this contract shall endure and continue for and during the full term and period of six years and three months from and after the first day of January, one thousand eight hundred and forty seven, unless sooner terminated or dissolved, as hereinafter provided. And the said Benjamin P. Gregory and John W. Maury, on their part, do hereby agree to assume the management of said lottery, and from and after the 1st day of January A. D. 1847, to pay to the said parties of the first part, and their successors, or to such person or persons as they may duly appoint, as the consideration for their appointment and for the sale and assignment of the full and exclusive power and authority to carry on and draw the said lottery, the just and full sum of $1460.00 in each and every year during the existence of this contract," &c.

There was a further provision, that "in consideration of the annual payments to be made by Gregory & Maury, they should retain for their own use the whole of the fifteen per centum to be deducted from the prizes; that they were to make the annual payments to the trustees, whether or not they should succeed in raising the same from the lottery clear of all expenses; also that they should retain for their own use all which they might raise from the lottery, over and above expenses and the annual payments to the trustees.

There were further stipulations on the part of the managers to pay all expenses, assume all risks, and to pay prizes drawn within twelve months after the drawing.

said Gregory and Maury were, under the contract between them and the trustees, drawing as grantees or assignees of the lottery privilege for a fixed term ; that, instead of their being appointed to raise by lottery the limited sum of $25,000, for the use of the State, the several managers appointed had been empowered, under color of the act, to exercise the lottery privilege *ad libitum,* during the terms granted by the contract ; and so were enabled to raise sums, unlimited in amount, for their own profit, paying to the State $25,000 as a consideration for the privilege—all which was contrary to the meaning and beyond the authority of the act.

(2) The bill alleged that by the act it was required that the managers to be appointed should, before proceeding to institute and draw the lottery, give bond to the State, with surety to be approved by one of the Judges of the State, and with condition for the faithful performance of their duties as such managers ; and that they should pay over to the trustees, or their successors, the net proceeds of the lottery to be drawn—such bond to be filed in the office of the Secretary of State. Yet, the bill alleged that no bond, as required, was ever given by Dudley S. Gregory, the first manager appointed ; that the second managers, although they began to draw from the date of their appointment, (July 1st, 1841) gave no bond until the 6th of May, 1843 ; that the present managers, Gregory and Maury, had, upon their appointment, given a bond to the State purporting to be in compliance with the act ; but that the bond so given by them, and also the bond given by their predecessors, Gregory and McIntyre, were not in conformity with the requirements of the act, inasmuch as such bonds were not conditioned to perform faithfully their duties as such managers, and to pay over to the trustees, or their successors, the net proceeds of said lottery, but were conditioned for the payment over to the trustees, or their successors, of the sum specified as the consideration

of the grant assumed to be made under color of said act.*
And so, the bill charged, that the bond given by the present managers was invalid, and the drawings were, on that ground, illegal.

(3) The bill further charged that the lottery privilege granted by the act had been exhausted; that the act authorized only the institution and drawing of a single scheme of a lottery, in one or more classes; such scheme being competent, by the usual deduction from the amount of prizes therein, to yield the sum of $25,000, authorized to be raised; that it was the duty of the managers to abstain from drawing such scheme, or any class thereof, until all the tickets of such scheme or class should have been sold, the managers having no right to gamble or run any risk; that the only profit which could be legitimately made by the said lottery was by a deduction from the amount of prizes; and that the only charges and expenses to be incurred were the actual expenditures and the salary of the manager or managers; that the deduction from said prizes to an amount sufficient to raise the required sum of $25,000, after allowing the proper expenses incident to the institution and drawing of the lottery, together with the salary of the manager or managers, was the whole amount intended by the act to be raised by the lottery authorized. Yet the bill alleged that the managers had, under color of said act, proceeded to institute and draw, through a long

* The condition of the bond given by Gregory & Maury was as follows:—
"That if the said Benjamin P. Gregory and John W. Maury do and shall, at all times during their continuance as managers of the said lottery, truly and faithfully perform their contract in all things relating to the same, which on reference to the articles of agreement between the trustees aforesaid and the said Benjamin P. Gregory and John W. Maury, dated this 10th day of December 1846, will fully appear; and especially pay all the prizes of all tickets sold in the several schemes, and pay over to the said trustees, or their successors, such sum or sums of money as they have agreed to pay, on the condition and in the manner they have agreed by the said contract to pay, then this obligation to be void," &c.

series of years, great numbers of separate and independent schemes of lotteries, the prizes in which had amounted to many millions of dollars; that said schemes contained a stipulation for the deduction from the prizes to be drawn of fifteen per centum, the aggregate amount of which deduction from all the prizes contained in the schemes would make, after the most ample allowances for expenses and for the salary of the manager or managers, a very large sum of money, far exceeding the sum of $25,000, authorized by said act to be raised; that not only in contemplation of law had more than the sum so authorized been raised, by the drawing of schemes competent, by the sale of all the tickets, to raise a much larger sum, but that the sum of $25,000 had *in fact* been realized from the drawings, as the same had been made, clear of all costs, charges and allowances contemplated by the act; and so, as the bill charged, the authority granted by the act had been exhausted, and the further drawing of any lottery under color of said act was wholly illegal.

The bill prayed a discovery, in answer to the matters alleged, and particularly as to the number of schemes which had been instituted and drawn, the amount of prizes therein, the percentage stipulated to be deducted from prizes sold, and the expenses incurred in instituting and drawing such schemes.    It also prayed a perpetual injunction against the further drawing of any lottery under the said act, and for general relief.

The answer of Kendal M. Lewis, Stephen Green and William Tunnell, the present trustees under the act referred to, admitted the passage of the act, the appointment therein of trustees and the substitution of trustees to fill vacancies, the several appointments of managers, and the execution of contracts with them for the drawing of the lottery, as in the bill was set forth.    These defendants disclaimed any knowledge respecting the giving of bonds by

the managers under the first two appointments; but they alleged that a bond was duly given, as under the act required, by the last appointed managers, Gregory and Maury. They knew nothing touching the method of drawing, or the proceedings on the part of the managers, but believe the managers to have acted with fidelity and within the authority of the act; that there had been paid over to the trustees the gross amount of $21,845.00.

The answer of John W. Maury, the survivor of Gregory and Maury, admitted the allegations of the bill touching the passage of the act, the appointment and substitution of trustees, and the several appointments of managers. It set forth at large the contract executed between the trustees and the managers last appointed; also the bond given by the managers, and insisted that the contract and bond were within the meaning and authority of the act. With respect to the allegations of the bill that the act contemplated the institution of a single scheme competent, by the sale of all the tickets and the deduction of a percentage from all the prizes, to raise the required amount, the answer alleged that such method of drawing had been long abandoned; that the act, in providing for the appointment of managers, contemplated that persons engaged in the trade and business of drawing lotteries would be employed, and that the lottery authorized would be instituted and drawn in the modes established and practiced in the business, such as had been pursued by the managers under this act; that, according to the true intent and meaning of the act, the sums to be paid over by the managers under their contract with the trustees constituted the net proceeds of the lottery; and that there still remained to be paid to the trustees upwards of $3,000, in order to make up the amount of $25,000, authorized to be raised. The answer refused to make the discovery prayed for by the bill, touching the schemes which had been in fact drawn, protesting that such discovery might subject this defendant to penalties under

the statute of this State declaring the unauthorized drawing of lotteries a misdemeanor. It submitted that this Court is without jurisdiction, inasmuch as the trustees, in their contract with the managers, exercised a power delegated to them by the Legislature, to which body alone they and the managers were responsible for their acts; also inasmuch as for any illegal drawing of lotteries there is a sufficient remedy at law by indictment.

Upon the filing of the bill the Chancellor granted a preliminary injunction. The answers being filed, a rule was laid upon the complainant to shew cause why the injunction should not be dissolved. Pending this rule, exceptions to the answers were filed—the exception mainly relied upon being to the refusal of the defendant, Maury, to make discovery touching the schemes which had been drawn under the act.

The cause came before the Chancellor on the 14th of November, 1851, for a hearing upon the rule to shew cause why the injunction should not be dissolved, and upon the exceptions to the answer. The argument at this hearing embraced three questions, viz: the jurisdiction of the Court, the sufficiency of the bond of the managers, and the obligation of the defendant, Maury, to make discovery touching the schemes drawn.

*W. Saulsbury*, Attorney General, with whom was *D. M. Bates*, for the State.

*W. H. Rogers, E. W. Gilpin* and *J. M. Clayton*, for the defendants.

JOHNS, JR., CHANCELLOR.—From the Act of Assembly, &c. which is the foundation of this suit, the bill of complaint filed and the answers of the defendants, must be ascertained the subject of controversy and the respective rights and remedies. These several matters, being understood

and defined, will determine the question of jurisdiction, and the appropriate remedy and mode of redressing any violation of the relative rights of the parties.

The first inquiry, therefore, must be directed to the Act of Assembly; as it confers the power and authority, and creates and vests the interests involved in the present suit. "The Act for the benefit of Sussex county" was passed for the purpose of raising, by a lottery, $25,000, clear of all charges and expenses ; and this amount, as a net sum or proceeds of the lottery, is directed to be paid to the trustees named, or their successors, thereafter to be appointed by the Governor, and by them to be disbursed, according to the appropriation thereof made by the act.

The first section of the act appoints the trustees, and confers upon them the power or authority, at any meeting to be held by them, at Georgetown in the said county, after the passing of the act, and by a majority of the votes of the said trustees who shall then be assembled, to elect and appoint one or more person or persons, not exceeding five in number, as manager or managers, to institute, carry on and draw a lottery, in one or more classes, for raising a sum, not exceeding twenty-five thousand dollars, clear of all expenses, costs and charges. From this section, I understand the law confers upon the trustees the power of appointment of the manager or managers, and by prescribing the mode of its exercise, by election, thereby excludes every other. And, when thus exercised, the manager or managers thus appointed derive from the Act of Assembly power to institute, carry on and draw a lottery, in one or more classes, for raising the net sum authorized to be raised.

By the 2nd section of the act it is made the duty of the trustees to notify the Governor of the State, for the time being, the name or names of the person or persons who shall be elected and appointed manager or managers, pur-

suant to this act. From this section and the following, as also from the Act of Assembly not having conferred any authority or control over the manager or managers by the trustees, nor delegated to them any power or authority to institute, carry on or draw the lottery; or, as in other lottery grants, to sell such right or privilege, I consider the manager or managers, when appointed, as authorized by the act, which is a public law, and as deriving from it expressly and directly the power to institute, carry on and draw the lottery; and, therefore, the manager or managers can be regarded, in the discharge of their duties and the exercise of the delegated power, in no other light than as agents of the State. It is in consequence of their sustaining this relation to the State and the liability of the State for their acts, in the exercise of the authority granted, that provision is made, in the 3rd section, for the protection and indemnity of the State, and to secure to the State, on the part of the manager or managers, the true and faithful performance of the duty of the said manager or managers, by requiring that the said manager or managers, previously to the publication of any scheme and the sale of any tickets in said lottery, shall give bond to the State of Delaware, in such sum and with such security as any one or more of the Judges of the Superior Court shall approve of, conditioned for the true and faithful performance of the duty of the said manager or managers in the sale of tickets, drawing the classes of said lottery, paying the prizes, paying over to the said trustees, or their successors, the net proceeds of said lottery, and managing all the business thereof.

By the 6th section it is enacted that all expenses necessarily attending the carrying of this act into effect, so far as relates to the instituting, carrying on and drawing said lottery, shall be paid by the said manager or managers out of the proceeds thereof. The law thus, in this 6th section, expressly confers on the manager or managers

full authority to defray all expense that is or may be necessary to carry the act into effect, so far as concerns the lottery.

The 8th section directs the trustees to give bond, conditioned to account for all monies received and disbursed by virtue of this act, and faithfully to perform all the duties and trusts reposed in them; which bonds, and also those given by the manager or managers, are to be delivered to the Secretary of State and filed in his office; and may be sued by any person or persons in the name of the State, for his or their use, who shall be injured by the breach of the condition thereof.

The 9th section enacts that this act shall be deemed and taken to be a public act.

Before adverting to the case made by the bill and answer it may be well to consider and understand the effect and operation of the Act of Assembly.

It has, by name, appointed certain persons trustees, who, as such, have a right to receive the net proceeds of a lottery and disburse the same to accomplish certain public improvements; but they are invested with no other authority or control over the lottery except the power of appointing, by election, the manager or managers. They, as trustees, are not responsible for the acts of the managers by them elected and appointed; for such managers are not their agents and cannot be ; for they, as trustees, have no power or authority conferred upon them either to institute, draw or carry on the lottery; and, therefore, they cannot delegate a power which they have not. They are trustees for the purpose of receiving and disbursing the net proceeds; and if the bond, as required by the 3rd section, is given, and taken by the person officially authorized, and in such sum and with such security as such Judge or Judges shall approve, and with condition as the act pre-

scribes therefor, upon a breach of such condition, in the non-payment over to the trustees of the net proceeds, they would, according to the 8th section, have a right to sue in the name of the State. For, the interest confided to the trustees is in the trust fund when received; and that is the only interest they have any concern with.

As I have already noticed, under and by the provisions of the act, the State stands in the relation of principal, expressly and directly delegating power and authority to the manager or managers, when elected and appointed in manner and form prescribed by the law; and, as a necessary consequence, they become the agents of the State in the exercise of the delegated power and authority, and the responsibilities and liabilities of principal and agent are the inevitable result. Thence arise interests altogether distinct and separate from the net proceeds, or that fund which the trustees may have a right to look after and take care of.

It may be very proper for the trustees to pursue their remedies and protect the trust fund; but if they should do so, or neglect to do so, it cannot be that because they can take care of the trust fund that, therefore, the State should abandon all control and have no right or remedy over its own agent. This would seem to be reversing the order of things, and placing the principal in the power of the agent holding and exercising an authority in violation of the trust and confidence reposed; and it cannot be sound doctrine, either here or elsewhere. It must be repudiated, as neither law nor in accordance with equity and good conscience. The trustees cannot revoke or annul a power they have not granted or delegated; nor have they any control over its exercise by the Act for the benefit of Sussex county. Yet, as the power and authority is granted, to be exercised by the agent until he raises a certain sum and defrays all expenses, costs and charges, the acceptance of such an

agency imposes the obligation to account; and, because such account may be required by the trustee of the trust fund, to ascertain the net proceeds, it would seem equally essential that the principal should have a right to demand it, to ascertain whether the power has been exhausted.

Further, by the terms of the grant the agent is required, before exercising the delegated authority, to give bond for the indemnity and security of his principal. If he fails to give such bond, in manner and form as specially required, it must be clear that for such omission none but the principal can apply the appropriate remedy, so as to restrain the irregular exercise of the delegated power. And this is to be done, certainly, not by treating his agent as a criminal, but by the appropriate remedy, well known and admirably adapted, not to punish but by its restraining influence to prevent injury and protect the right.

This liability of the State as principal for the acts of the manager or managers of this lottery appears to me to sanction the adoption by the State of such proceedings as any individual would be entitled to under similar circumstances.

It may be that the agent is proceeding without having given bond, as required : if so, the principal has his remedy by injunction. But such act of omission does not vacate the previous election and appointment: it only authorizes the suspension of the exercise of the delegated power by the legitimate remedy and by the authority of the proper tribunal. If the Act of Assembly had vacated the election and appointment of the manager or managers, on the omission or failure to give bond as required by the 3rd section, as has been done with respect to certain officers, then, as the delegated power and authority would have been revoked, there would be good ground for proceeding at common law, either by *quo warranto* or in a criminal court by indictment.

Having thus considered the Act of Assembly and its effect and operation, for the purpose of deciding the ques-tion of jurisdiction, it is only necessary to determine what is the object of the suit and the relief prayed. This can be ascertained from the bill, which, after setting forth the Act of Assembly, alleges, as against the trustees, a breach of their duty by exceeding their power in contracting with the manager or managers, after their election and ap-pointment; and, contrary to the provisions of the act, taking bond to secure, not the net proceeds but an annual sum, as the consideration for the right to institute, carry on and draw the lottery; and, as against the managers, the object of the suit is to restrain the further exercise of their power or authority, because they have not given the bond in manner and form as prescribed by the 3d section of the act; and, additionally, on the ground that the power and authority has determined by the sum having been raised which the act authorized to be raised; and, with a view to ascertain whether the power has been exhausted, the bill prays a discovery of the schemes and classes drawn by the manager or managers, alleging that the continuance and further exercise of the authority by the manager or managers is contrary to the said Act of Assembly; all which, although it may be charged as contrary to the said act, and therefore unauthorized, is only equivalent to a charge of a breach of duty and of the trust and confidence reposed in the agent or manager. It is not necessary that I should here decide whether the defendants have fully answered or not, as I am only considering the question of jurisdiction. That matter will arise upon another part of the answer.

If, then, I have correctly apprehended the object of this suit, the subject matter, as against the trustees, is a com-plaint for a breach of trust; and, as against the manager or managers, not only a breach of their duty in doing what is contrary to the trust and confidence reposed in

them as agents, but in omitting, as such agents, to execute the bond and give security for the indemnity of their principal, as by the Act of Assembly is required.

The answer of the trustees admits the material facts charged, as against them, viz : their appointment, the election of managers, the special contract between them, as trustees, and the managers, the bond taken to secure the annual payments, pursuant to the contract; and only states, what is no doubt true, that they are ignorant of the matters inquired about concerning the management of the lottery.

The answer of the defendant, Maury, the surviving manager, admits the material facts stated in the bill, viz, the passage of the Act of Assembly and the election and appointment of him by the trustees. It claims to derive his authority from the act and not from the trustees, admits the special contract and appends copies as well of his election and appointment as also of the special contract made by him and the deceased manager with the trustees for a sum annually payable by them to the trustees, as the consideration for the right to draw the lottery, for a certain number of years, &c. It also admits that the bond executed and given was such as the trustees directed and took to secure the payments according to the said contract; a copy of which bond is appended to the answer and sworn to as certified.

On adverting to the bond appended to the answer it appears to be a bond to secure the payments according to contract, &c., and does not contain any certificate of its being taken or approved by any Judge of the Superior Court of the State.

Hence, from the bill and answer, it appears that the object of the suit concerns a matter of trust, against trustees, and also of trust and confidence by a principal against his agent, as manager of a lottery, to be instituted,

carried on and drawn under his authority ; and especially is the suit for the protection of the principal, by restraining the further exercise of the power or authority granted to the manager, because he has not executed the bond in manner and form as by law required ; and, additionally, because he has exhausted his power, and has no authority to continue to exercise it ; and to ascertain this fact the bill prays a discovery.

From this statement of the case, I entertain no doubt of the jurisdiction of this Court ; and as the matters in the suit instituted relate to and concern transactions of trustees and the rights and liabilities of principal and agent in the exercise of fiduciary powers, requiring a discovery and an adjustment of the account of the agent as manager of a lottery ; therefore, I have no difficulty in exercising the jurisdiction.   I may add that the jurisdiction of this Court to restrain the unauthorized drawing of lotteries has been fully considered and sustained by the courts of Maryland. *Lucas et al. vs. The Lottery Commissioners,* 11 *Gill & Johns.* 490 ; *Lucas vs. McBlair et al.* 12 *Gill & Johns.* 1.   In *Attorney General vs. Forbes,* 2 *Myl. & Cr.* 123, (14 *Eng. Ch. Rep.*) the general authority of the Court to restrain by injunction unauthorized acts of public functionaries, to the detriment of the public, is discussed and sustained.

With respect to the other ground of objection, that there is an adequate remedy at law,—if I am correct in the view taken of this case, I cannot discover how the principal, under the circumstances existing and admitted in this suit, could have relief at law.   The special license having been granted, and the answer disclosing that it has been legitimately conferred, although its exercise may be irregular, it cannot be criminal, nor subject to be controverted by writ of *quo warranto* ; therefore, I consider that sufficient relief can only be had in this Court.

The protest and refusal to answer as made by Maury,

after having in his answer admitted his agency as manager, cannot entitle him to the privilege of withholding from his principal a full account of his transactions as manager, in instituting, carrying on and drawing the several classes of the lottery; for this obligation he voluntarily incurred by accepting the appointment and acting under it. The privilege can only be claimed when the object sought by the discovery is to make a criminal charge, and not when the party interrogated has, by his own act, contract or engagement, deprived himself of the right to claim the protection of this rule of equity. If a person will accept an appointment of trust and confidence, as manager of a lottery, he cannot, when called to account, either for irregular or for an unauthorized exercise of authority by virtue of the power delegated, withhold the discovery of his transactions on the ground that there may be a law making it criminal for a person, without special liberty, to set up and draw a lottery. In the present case the complainant makes no charge of any criminal offence, and all its charges are that the transactions, of and concerning which a discovery is sought, were contrary to and without the authority of the act which expressly grants to the defendant the special liberty to institute, carry on and draw a lottery. To suffer the defendant in this case to shield himself under the equitable rule which allows a defendant to refuse answering that which would subject him to penalty or criminal prosecution would enable the grantees of lottery rights and the managers thereof to abuse the special liberty conferred and to perpetrate the grossest fraud without discovery. For, in this case, I may with propriety remark, as was said by the Vice Chancellor in the case of *Green vs. Weaver*, 1 *Sim. Rep.* 404, (2 *Eng. Ch. Rep.*) that two propositions may be assumed, viz: (1) that the policy of the law requires that an agent should not only act with fidelity to his employer, but should be ready at all times to render a full and clear account of his

transactions; and (2) that, from the nature of this case, the defendant must possess, and perhaps exclusively possess, the means of stating that account which the policy of the law entitles the plaintiff to demand.   I think these propositions are clear in their application to this case.

That I am right in considering that the general rule of equity is not applicable to the present case will more fully appear from the observations of the Vice Chancellor in the case above referred to, (*Green vs. Walker.*) in which the defendant refused to answer because the discovery of the facts called for by the bill would subject himself not only to the penalties, but also to give evidence against himself that he had been guilty of a breach of his oath; and, on these grounds, he claimed the benefit of the rule which protects a man from criminating or subjecting himself, by his own discovery, to penalties.   After stating the ground upon which the defendant considered he was entitled to refuse the discovery, the Vice Chancellor, Sir J. Leach, makes some observations which I cannot do better than to quote in full.   He proceeds to say :   " Now, that the " rule of a court of equity is that a man shall not be com- " pelled to answer to any facts which may tend to crimi- " nate or subject him to penalties or forfeitures is undeni- " able; but the due application of this rule to the circum- " stances of individual cases has been at all times a matter " of much controversy; and so much so that I believe not " less than one hundred cases are to be found in the re- " ports, in which the question was whether the defendant " was or not bound to give the discovery sought for.   The " due application of the rule to the present case is that " which I have labored to arrive at.

" If I decide that the defendants are bound to answer it " may be said that my decision is inconsistent with the " doctrine laid down by great Judges in former cases.   If " I decide that the defendants are not bound to answer I

" may render those acts of Parliament, especially framed
" for the purpose of protecting principals from the dis-
" honesty of their agents, a cover to their agents in the
" grossest and most scandalous frauds; for, stript of the
" effect of the statutes as inflicting penalties, it would be
" the common course of a court of equity to compel each
" of these defendants to state on oath whether they were
" employed as brokers and agents of the plaintiff; and
" whether they acted in that capacity; and to set forth
" every particular of each of the defendant's dealings, as
" agent or broker of the plaintiff; and to produce every
" entry in his book and every document relating to these
" transactions.

" If a court of equity, in this case, should protect the
" defendants from the discovery, the plaintiff's proceeding
" at law must be quite nugatory; for the materials of evi-
" dence must necessarily rest, almost exclusively, in their
" possession. I hope this question may be decided without
" my falling into the dilemma of impeaching any anterior
" decision.  I have looked through every case on this sub-
" ject that was cited; and, most especially, I have applied
" myself to those which were before Lord Eldon, which
" have been much relied on.  I have looked through a
" great variety of those cases, and I believe I have consid-
" ered every case that a diligent search in the books has
" enabled me to find, that has any bearing on this question.
" Upon those cases that I do not now rely on, it may be
" sufficient to say, they established the general principle,
" and must protect the defendant against the discovery.
" But, from the current of authority, I think this result may
" be derived, as established by a series of decisions, travel-
" ing through a long series of years, namely, that a man by
" the effect of his own acts, may exclude himself from the
" benefit of that rule of a court of equity; or, to adopt the
" expression of a very great Judge, he may contract him-
" self out of the protection afforded by the principle of the

" Court. The first case that I allude to as establishing that
" proposition, that a man may so contract himself out of
" the protection of the Court, is the case of the *African*
" *Company vs. Parish,* 2 *Vern. R.* 244, decided in 1691. It
" was a short case, as the majority of Vernon's cases are.
" It is thus : ' The African Company hired the defendant's
" ship to freight. The defendant, by charter-party, as is
" usual in like cases, agreed that if the defendant traded in
" goods the Company dealt in, he would pay such and such
" particular sums to the Company in respect thereof; that
" is, in the nature of a forfeiture or penalties, and would
" deduct such sums out of the freight that should be coming
" to him. The bill was filed by the Company to discover
" whether the defendant had or had not traded in any such,
" and what, goods: and the defendant pleaded the charter-
" party (on which it appears the sums therein mentioned
" were double the value of the goods themselves, and so
" were in the nature of a penalty) and that he ought not
" to be compelled to make a discovery by answer touching
" the same, so as to subject himself to such penalties. The
" short decision is; the defendant must be bound by his
" own agreement : having agreed that it shall be deducted
" out of the freight, he ought to discover ; it having been
" adjudged so several times in cases of the East India Com-
" pany.' Now, the note refers to the East India Company's
" cases, which I have not been able to find. This note,
" short. as it is, will appear a little elucidated by Mr.
" Raithby's edition of that book; but it is inconsistent
" with the principle held by other Judges. The next case
" that I find is, the *East India Company vs. Atkins,* 1 *Strange*
" *R.* 168. That case was decided about thirty years after
" wards, in the year 1720 ; and the language of that case,
" in the judgment, is very important as to a subsequent
" part of the present case. I shall not take up time in
" going through deliberately all these cases, because the
" cases being before counsel, it will be a waste of time.

" The short note is this : ' that where a man submits to
" be examined as to matters which are penal to him, equity
" will not interpose.' The result however, is that in the
" judgment in that case it will be found to rest on the rea-
" soning that a man, having contracted to make the discov-
" ery, is bound to do so. The next case that I consider of im-
" portance is that of the *South Sea Company vs. Bumpstead.*
" 1 *Eq. Cas. Abr.* 77, and was decided eight years afterward,
" in 1728. The agreement in that case was under a simi-
" lar contract, by penalty, not to trade beyond a certain
" extent, and the discovery sought was whether he had
" violated that contract. The objection was that he would
" subject himself to penalties. The Court thought that,
" as he had covenanted not to plead or demur, he could
" not then object to the illegality of that covenant, and
" that he was bound to make the discovery ; and in the
" judgment there the Court recognizes the authority of the
" *East India Company vs. Atkins.* The next case is *Wilson*
" *vs. Prince,* 2 *Ves., Sr.,* 244, which appears to have been
" decided in 1746, but is not reported. It was cited in
" argument before Lord Hardwicke, and I give credit to
" the case as cited before Lord Hardwicke.

" I think, from this series of decisions, there is sufficient
" to authorize one to decide that a man may contract so
" as to incur the obligation to make the discovery of all
" the facts relative to that contract, although the effect of
" that discovery may incidentally subject him to pecuniary
" penalties. The reasoning of Lord Eldon, in the cases of
" the *East India Company vs. Neave,* 5 *Ves. Jr.* 173, and *Pax-*
" *ton vs. Douglas,* 16 *Ves. Jr.* 239 ; 19 *ib.* 225, imply that he
" assents to the principle, that a man may by his conduct
" incur an obligation to discover the facts, although that
" discovery may incidentally subject him to pecuniary ob-
" ligations. *Paxton vs. Douglass* has been a good deal
" relied on by the other side ; and I am free to confess that
" that case did perplex me excessively by some of the dicta

" laid down by that great Judge. For, he went there to
" the extent of stating not only that a man should not
" make a discovery that would subject himself directly to
" a penalty, or criminal prosecution, but that every ques-
" tion leading incidentally to that conclusion would be
" likewise equally objectionable. Now, when one comes
" to look at that as a proposition unexplained, one cannot
" help seeing that the true principle of a bill in equity is
" that every statement of fact in every bill ought to be in-
" cidentally leading to the same conclusion ultimately as
" the prayer of the bill does lead to ; for the fact is either
" conducive to the general result, or it is unimportant and
" irrelevant. But I take Lord Eldon to have meant (what,
" perhaps, is not very fully explained in the report, and
" what satisfied my mind a good deal) not that every fact
" which may lead to the effect of subjecting a defendant to
" a penalty, is objectionable; but where the sole gist and
" object of the suit is to convict a man in a penalty—
" where there would be no other purpose but to have re-
" lief in a court of equity on the footing of penalty, that,
" as a court of equity does not relieve on penalty, it will
" not give any incidental discovery. That is the way I
" reconcile and get rid of the dicta laid down in *Paxton*
" *vs. Douglass.* But, however, when one looks at what Lord
" Eldon did in point of declaration in the other cases, and
" most especially in the case of *Ex parte Dyster*, 2 *Rose* 349 ;
" 1 *Meriv.* 155, one cannot help thinking that he could not
" have intended to lay down the doctrine in a general, un-
" restricted manner. The case came on upon a bankrupt
" petition to prove a debt against a certain bankrupt's
" estate. The objection, in answer to the petition, was that
" as the petitioner traded as a principal at the same time
" as he was acting as a broker, and participating in brok-
" erage profits (which the law prohibited) therefore, the
" law would not permit proof to be made of profit acquired
" by such trading. Lord Eldon throws out a suggestion

" that he has nothing to do with the act, so far as it respects " transactions between the broker and the city of London ; " and he permitted the debt to be proved. Now, it cannot " be doubted that, if he admitted the debt to be proved in " that case, the discovery sought by the bill ought to be " made.

" Then, the next question is, inasmuch as the objection " to make the discovery arose, in the cases I have referred " to, from the stipulations of instruments under seal, can " the solemnity of the seal make the obligation to discover " more obligatory in a court of equity than the moral ob- " ligation resulting from the relation of principal and agent, " when one reposes and another accepts the confidence so " reposed ? The reasoning of the judgment in the case of " the *East India Company vs. Atkins,* I think, shows con- " clusively an opinion that such was the moral obligation " that, on that ground, the discovery ought to be made. " Although *Strange* is not a book we can place much con- " fidence in, yet in this particular instance it appears to be " a very able and sound judgment and well reported. I " should say that a court of equity knows no difference " between a mere moral obligation and one resulting from " stipulation by deed."

These principles, so fully and lucidly discussed by the Vice Chancellor, are clearly applicable to the case before me ; and I consider the defendants as bound to make discovery of the matters necessary to enable this Court to determine whether the authority given by the act under consideration has been exhausted. It is, therefore, ordered that the exceptions to the answer of the defendant, Maury, be allowed ; that a further answer on the points excepted to be made, and that meanwhile the injunction continue in force.

This case was never further proceeded in, the defendants submitting to the injunction.